The next case this morning is 525-0083, People v. Lee. Arguing for the appellant is Brooke Winterhalter. Arguing for the appellee is Max Watson. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note only the clerk of the court is permitted to record these proceedings today. Good morning, counsel. We have read your brief. We're looking forward to your arguments. You have, I think, at least four issues to present to us. So, Ms. Winterhalter, you're ready to proceed? Yes, Your Honor. All right, you may do so. Thank you. Thank you. Good morning. My name is Brooke Winterhalter. I'm from the Office of the State Appellant Defender, and I represent Omarion Lee, the appellant. May it please the court, counsel. Your Honors, in this appeal, I want to focus on the type of assistance that our Constitution promises to every criminal defendant. The assistance that's necessary to ensure defendants receive a fair trial and a meaningful opportunity to challenge the case against them. In this case, Omarion Lee, a teenage defendant with no adult experience in the adult criminal system, was charged with murder and facing a de facto life in prison, and he did not receive that constitutionally required assistance here. Counsel's errors are fully spread of record. They occurred pre-trial, during trial, and post-trial at sentencing. But I would like to focus on the errors that occurred at trial, and then the pre-trial errors, so issues two and three in the brief, during my arguments. Beginning with the trial errors, here, during cross-examination, not during the state's case, and the state's direct examination, trial counsel presented the most damaging evidence against Omarion. First, while cross-examining the state's key civilian witness, Aja Dixon, defense counsel introduced the only evidence suggesting Omarion had a criminal state of mind, an attempt to kill, when he came to her door that morning. Trial counsel asked Aja, during cross-examination, whether she had previously told the police that Omarion came to her door and said, if there's a guy in here, I'm going to kill them. Aja responded she had mentioned that on direct examination, but now that defense counsel reminded her, yes, he said that, and actually what he said was, whoever in here is fitting to die. There was no strategic purpose for introducing this statement, as the state has argued in its brief, and doing so was objectively unreasonable, as this court has held, and more. Counsel is supposed to use the rules of evidence to keep damaging information, damaging hearsay statements, out of trial. He did not do so here. He introduced it. What was counsel trying to impeach the witness for that line of questioning, and it seemed to have backfired? When I read that questions and answers, it seemed to be the case. Am I wrong? Your honor, counsel actually stipulated before trial, and during Aja's direct examination, that the ring doorbell camera, which could have potentially recorded such statements, was at a neighboring door, and that it was motion activated, not sound activated, and he stipulated it recorded at 7.05 and 7.07, when the person that she identified as Omarion entered, came to the door at 7.05, and then ran past at 7.07, so there is a minute of sound completely missing, and he stipulated the doorbell would not have captured it, so no, had he read his own stipulations, there could have been no strategy to impeach, which is why introducing these statements, particularly here, where there are four other men inside of the apartment that also flee, was incredibly damaging to his case and to his trial. The second statement he introduces is during cross-examination of one of the two key detectives here, Detective McCartney. Trial counsel asks him whether he had had a prior conversation with Aja, during which she made a statement to Omarion saying, you are weird, why would you come here and do that? Throughout Aja's direct examination, there was no indication that she spoke to him afterwards and confronted him about something. So again, the most damaging evidence, and the you are weird statement in particular, the trial court relies on in reaching its verdict, comes not from the state, but from defense counsel, and our constitution expects something different, promises defendants something different. Introducing these statements were particularly harmful and doing so was objectively unreasonable. It was completely inconsistent with his strategy, which was that one of the other four men fleeing the apartment and not speaking with police caused the fatal, fired the fatal shots. We know there were eight shots fired here, not Omarion, that he was fleeing from those same shots. And then the second set of errors I want to focus on our pretrial and introducing Omarion's entire recorded interview and his subsequent admission that the cracked cell phone was his, a cell phone that the trial court relies on explicitly again in reaching his decision that Omarion, not one of those other four men, was the shooter. The trial, the shooter, the trial court also relied on two other things in Omarion's recorded of being at Omarion at Asia's apartment that morning. And he relied on, and the state quoted in closing Omarion's statement in that video, if I were there, I would have worn a mask or I had on a mask. That entire interview should have been excluded from trial. Omarion had been arrested around 730 a.m. in a car with his mother. He was 18 years old. His mother was driving. They were separated. They were placed in two separate interrogation rooms. The state doesn't contest. He was detained. He was subjected to a custodial interview. The issue here really is whether he gave a knowing and voluntary waiver of his right to remain silent and his right to have an attorney present for that questioning. That whether a waiver is knowing and voluntary depends on the totality of the circumstances and some of the totality that this court can consider is his age, how long he's been detained, the fact that he has not slept. And he's asking about his mother. He keeps knocking on the door, asking what's going on, why his mother's detained, why his mother's crying in the room next door to him. And the police, we're coming to you, we're coming to you. He's trying to read what's on the wall. He asks about recognition when the wall actually says recognizance. And so the state does argue he's intelligent, he's graduated high school. To some extent that's true, but he has no experience in the adult criminal system. He is just 18 years old. He spent the morning with his mom. He's been separated from her. The evidence suggests he has not slept. And they walk in and they say, we're finally here to talk to you. As you know, you're sitting in this room, you're detained, you're in handcuffs. I have to read you these rights. He reads through them. And then he says, and how old are you? 18. In that detective's mind, now he doesn't have to ask these two incredibly important questions for a young person. Do you want to waive your right to silence? Do you want an attorney? And then he says, I need to grab your administrative stuff. And he walks through your age, where do you live? And then he says, your mother's told me this, suggesting your mom's already told us where you were last night. You have to keep complying. And he's completely removed these key pieces of constitutional information, these key rights that in all reality, Amarion's not waiving them by saying I'm 18. My name is Amarion. My middle initial is J. He's not actually saying everything I say should be recorded and used against me in a court of law. He's not actually saying I'm being investigated for murder and I don't want an attorney here. He's not thinking about any of that. He's thinking about how can I get out of here? How can I stop my mom from crying? And these circumstances here are incredibly damaging. And the question really is, did he not? And I will bring it to a wrap. I'm looking at my time now. Taken together, counsel's heirs did prejudice his trial. And that's really the question, is there a reasonable probability? It's not the Jackson reasonable doubt question. It's not the, it's not more probable than not. Is there a reasonable probability here that had counsel not committed these errors, had counsel not done these things, could the court have reached a different verdict? And here the answer is yes. In this case, we have two, the only people that are kind of eyewitnesses, they were not present at the crime scene. There are eight shots fired. Amarion, the person, the women identify as Amarion runs out, four other men flee. The women tell them to flee. The police never talked to them. They maybe talked to someone who claims to have a street name Marmar. That's it. There are four other suspects here, never investigated. And Amarion's arrested within 30 minutes with his mother. No gun is found. No gunshot residue found on him. When a gun is fired eight times in an enclosed space, there is a reasonable probability that someone else in that room fired those shots and was not investigated. And Amarion, just like the other four men, was fleeing a shooter. There are also multiple ways to get in and out of that exit as you watch the videos that show Asia coming to and from, from a back door and from upstairs. And for all these reasons and those in our briefs, ask that you reverse and remand Amarion's case for a new trial. Thank you. Great. Thank you. Questions, Justice Schiller? No questions. Thank you. Justice Bollinger? No questions. Thank you. All right. Thank you. You have a moment for rebuttal momentarily. Mr. Watson, you're ready to proceed? Yes, your honor. May I do so? Morning, your honors. May it please the court. My name is Max Watson. I represent the state in this matter. As counsel discussed, there were four issues raised here. Three of them all kind of revolve around ineffective assistance of counsel. I'll go ahead and do the same as counsel, kind of focus on issues two and three. If you have any questions about the other issues, I'm more than happy to answer those as well. But in regards to issue three, so this is whether trial counsel performed efficiently for eliciting alleged damaging statements from the witness. The state's argument that this was clear trial strategy, whether it worked or didn't work, is kind of beside the point, but it was certainly trial counsel's strategy to try and impeach these two witnesses, Asia and Lupe. This was shown in the very first sentence of his opening statement, that credibility was at question between these witnesses. And essentially, the statement that was elicited was, there were a few different iterations of this, but if there's a guy in there, I'm going to kill him. I'm fitting to kill him, something along those lines. When defense counsel elicited these statements, he was clearly trying to impeach Asia at that time. Just prior to that, he was asking her about an alleged false police statement that she made. What the goal was, was to show that she's testifying about things that are not provable, either in video evidence or otherwise. Without their testimony, they are the two witnesses that personally identified defendant as being the person that showed up at her apartment, that forced his way in. And then after they left that apartment, because someone had just forced their way in, gunshots are heard and a sleeping victim is dead. It was clear trial strategy that he was trying to get them impeached. It was stipulated that, you know, the ring doorbell camera wouldn't have brought it up, but that doesn't negate the point that he was trying to catch her off guard and try and get her to show that statements that she testified about maybe weren't said. And in regards to that, I don't have a whole lot more other than going to kind of the prejudice prong, that even if this statement was taken out, was never brought up, there certainly was more than sufficient evidence to show that. Did the trial court even cite that statement in the written judgment? I didn't see that in the dialogue. Was that even relied upon by the trial court in this judgment? I'm sorry, your honor. Can you repeat that? It kind of, it may be my internet, but it was kind of cutting in and out. Okay. Can you hear me now? I can, yes. Okay. Did the trial court even cite that statement by Asia in its written judgment? No, your honor. As far as my recollection goes, that was not what the trial court found indicated in their finding guilt. What was relevant to them was geolocation data that explicitly shows that the defendant traveled from his house to Asia's apartment at the moment the murder occurred. The other testimony from the witnesses, the clothing that defendant was wearing that bashed the ring doorbell camera that he was arrested in, all of that evidence was discussed, but the statement itself wasn't. And I know the appellate counsel kind of said it goes to show the intent element. That can be shown through a number of other ways. The fact that the defendant fired seven to eight shots into a sleeping victim alone would show an intent to kill. Possibly that's why it was not brought out by the state at the time. Regardless of this, you know, we stand on our argument. It was clear trial strategy in regards to bringing that statement out. And then again, as you mentioned with the prejudice, the defendant was not prejudiced by that statement alone coming out. There was sufficient other evidence that tended to show the defendant was guilty. I will move over to issue two now, unless there's more questions with that. No. So as issue two, this is whether trial counsel performed efficiently by failing to seek suppression of custodial statements. State would argue that this court should affirm defense conviction for two reasons. First, any motion that would have been filed would have been without merit. And second, defendant was not prejudiced by trial counsel decision not to seek suppression. There were two aspects argued in defendant's brief. It was the whether defendant waived his Miranda rights and then whether the detective scrupulously honored defendant's invocation. So as far as the waiver, state's argument is that this was an implied waiver of defendant's Miranda rights. The detectives, the very first thing they did when they came in was go through and read those Miranda rights and then defendant willingly continue to have this conversation with the detectives. There's no magic words that need to be said to ensure that a defendant knowingly, voluntarily waives this right. And I think some of the factors that apply to defendant show that he was more than capable of waiving that Miranda right. Defendant was 18 years old at the time. Is that young? Yes, but he was an adult at the time. And in regards to whether his mother should have been in the interview room at the time is misplaced. Defendant was an adult when he was being questioned by police. Line has been drawn at 18, you're an adult. And those different stipulations or aspects of being an adult apply to you. Defendant had graduated high school. He didn't indicate that he had any learning disabilities. And he did have a juvenile record for criminal damage to property. He did have an adult record, but again, he was recently 18, but he had experience with the criminal justice system. And based on those factors, state would argue that defendant certainly had the required maturity and intelligence to understand his constitutional rights. And this is further shown when defendant invoked those rights. I think it's hard to argue that defendant was not aware that he had these Miranda rights after they read to him. He's had this conversation for 30 minutes and then invokes those rights and says, I don't want to speak to you anymore. State would argue that's a clear showing that he had that knowledge at the time when he started the conversation. As far as the invocation, defendant invoked his right to remain silent. Immediately, the detectives stopped their questioning. They got up and left the room. That's precisely what they are supposed to do in that situation to scrupulously honor their invocation. The detectives returned. They had to do a gunshot residue swab. They had to take photos of the defendant. Defendant began speaking to them and asking them questions and trying to talk to them. They were kind of standing by the doorway. They were trying to get out, see if he wanted to continue talking. They ended up leaving. At that point, defendant starts yelling through the door. He wanted to talk to his mother. They told him that that's not going to be possible at this time. And eventually, the defendant continued to re-engage that conversation with them. And it was reasonable for them to believe that he wanted to continue speaking with them. As to those statements post-invocation, those were never played before the court. So state's argument is that defendant was not prejudiced by any of those statements that happened, even if it was an error for them to continue that conversation. Those were never played before the court and had no bearing on defendant's guilt. Defendant does talk about the cell phone identification, that the defendant identified a cell phone that belonged to him to the police after the invocation. So if we're going to say that was not scrupulously honored and that the only thing that was said was the cracked cell phone was mine, the police were already in possession of that cell phone. They didn't use that information to go out and find the cell phone. I think this would be a very different situation if he said, my cell phone's at my friend's house and they went and got a search warrant for the friend's house to go get it. They were already in possession of it and there were other ways. The cell phone was in the passenger seat of the vehicle where the defendant was located, is that correct? Correct, yeah. Yeah, when he was arrested. Your position is they took possession of it, they could have gotten a search warrant, search, is that what you're... Yes, and that it would have been identified as his cell phone regardless. There were selfie photos of himself on the phone. There's other identifying information that could have linked it. So to say that the police only learned that it was his cell phone based off a post-invocation statement is misplaced. And I can see my time has expired. If I could just briefly conclude. You want to conclude? Yes, please. Yes, yes. Just for these foregoing reasons, we ask that this court affirm defendant's conviction and sentence. Thank you very much. Thank you. Questions, Justice Schomer? No, thank you. Other questions, Justice Bollinger? No, thank you. All right. I have no questions either. Ms. Winterhalder, rebuttal. You're still muted. There you go. Thank you, Your Honor. I have one factual point I want to make, and then I want to respond to three legal points. So beginning with the factual correction, this state, both in its briefs and now, has suggested that Mr. Watson was shot while he was asleep. But the evidence suggests the opposite. He was found apart from the bed, fully dressed. And Asia made a prior statement describing Watson as he was up, so maybe he came out of the room. And then Officer Marquez, the arriving officer, explained that Watson was heading that way. He was moving when he was shot. So the evidence here at trial suggests he was awake, not asleep when the shots were fired. And then my legal responses, I want to focus first on trial strategy here. In order for something to be trial strategy, in order for something to be impeachment strategy, trial counsel has to have a way to perfect the impeachment. Otherwise, they're not following the legal rules. And here, there was no way to impeach Asia with a record of silence because there was no recording from 705 to 707. There was no strategy there. And the same with respect to the second statement that she purportedly made to McCartney at some point. He had no way to impeach that statement because there was no recording of that conversation. So these come in ill-advised at best and unfought out and against the legal rules. And then with respect to the Miranda, an actual voluntary and knowing waiver, it's a totality of the circumstances question. And there are cases that say, it is true, age is relevant. It's not, he is 18. So the statutory, the statute that applies to those under 18 certainly doesn't apply to him. But the common law is still informed by a person's age. And we still look at the totality of the circumstances, how the rights are given, whether they are minimized, whether they actually have value. And when a person is removed from their parent early in the morning, it's a far older case, but Starling has a very comparable situation in which a young defendant was removed from his family early in the morning. And that was found to be a non-voluntary and non-knowing waiver of his rights. And the same occurred here. And last, with respect to prejudice, it's a reasonable probability of some different outcome, something that undermines our confidence in the verdict. And here, it's all the evidence that was in front of the court. But we know explicitly that he relied on Amarion's denials of being there. He relied on the cell phone evidence. And there is no other evidence that Amarion arrived there with a criminal intent, a criminal purpose, absent those statements that counsel introduced. Absent those statements, we have no, and even with them, we have no idea what happened inside this apartment. We have no idea whether there was a confrontation, why someone responded, who was the target. The record is completely void. We have five, well, we have six, at least six males inside this apartment, five flee before police arrive. And we do not know who the shooter is. It is Asia and Lupe's testimony that Amarion was the last person to arrive. But that's it. And we don't know what AJ, that's the victim in this case, what he was doing when he woke up. And absent counsel's errors, there would have been less evidence indicative of Amarion's guilt in this case, which gives us a reasonable probability of some different outcome. And we should question the verdict here given counsel's errors. For these reasons, and especially those in our briefs, we would ask this court to reverse and remand Amarion's case for a new trial. If it does not, I reverse it outright. Thank you. When a defendant denies even being there, though, and the ring camera video shows him wearing distinctive clothing, pants pulled down, certain color of underwear, and all that's visible. And then when they arrest him, he's wearing the same clothing you can see on the ring video. Doesn't that call his credibility to question? Your Honor, his denials would call his credibility into question, but it is our position. And it is my position those should not have come in. He gave those statements without knowingly waiving his right to remain silent and have counsel present for them. And that question is precisely what the trial court relied on here in reaching his verdict and why there's a reasonable probability of a different outcome. All right. Thank you. Thank you. Questions, Justice Schiller? No questions. Justice Bollinger? No, thank you. All right. We appreciate your arguments. We'll consider those along with the briefs you filed. We'll take this matter under advisement and issue a decision in due course. Have a good rest of your day. Thank you.